UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| MIRANDA ADAMS, | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF COUNCIL BLUFFS, | ) | **COMPLAINT** |
| | ) | |
| Defendant. | ) | |

Plaintiff Miranda Adams, by and through her Attorneys of records, states and alleges as follows:

## INTRODUCTION

1. Plaintiff Miranda Adams is a thirty-six-year-old female resident of Council Bluffs, Iowa.

2. Until March 31, 2023, Plaintiff was employed by the City of Council Bluffs Police Department ("CBPD" or the "Department"). Plaintiff is currently unemployed.

3. Plaintiff had been employed with the CBPD as a sworn officer since 2012.

4. On March 31, 2023, Plaintiff was terminated from the CBPD following a CBPD investigation that was commenced after Plaintiff filed a complaint with the Iowa Civil Rights Commission and the EEOC. Her complaint, *inter alia*, alleged retaliation.

5. On September 11, 2023, the Iowa Civil Service Commission for the City of Council Bluffs, IA overturned the City of Council Bluffs' termination of Plaintiff.

6. Despite the Civil Service Commission's unanimous decision, the City of Council Bluffs refused to reinstate Plaintiff, in direct violation of the Civil Service Commission's Order.

7. The Defendant's termination and subsequent refusal to reinstate Plaintiff violated the Title VII of the Civil Rights Act and Iowa law, and Plaintiff has suffered substantial harm as a result.

## PARTIES and RELEVANT PERSONS

8. Plaintiff Miranda Adams is a thirty-six-year-old female resident of Council Bluffs, Iowa.

9. Defendant City of Council Bluffs is a municipality incorporated in the State of Iowa. Defendant City of Council Bluffs qualifies as an "Employer" within the meaning and definition of, according to *42 U.S.C. § 2000(e) et. seq.*, in that Defendant City of Council Bluffs is engaged in an industry affecting commerce and has fifteen or more employees for each working day and twenty or more calendar weeks in the year. Moreover, Defendant City of Council Bluffs was and is responsible under law for the acts and omissions of its law enforcement officers, agents, and other employees, including those whose conduct is at issue in this lawsuit. Defendant City of Council Bluffs also qualifies as an "Employer" within the meaning and definition of the Iowa Civil Rights Act, as it "means the state of Iowa or any political subdivision, board, commission, department, institution, or school district thereof, and every other person employing employees within the state." Iowa Code *§ 216 et. seq*.

10. Timothy Carmody ("Chief" or "Chief Carmody") was, at all times relevant to this action, the chief policymaker for the City of Council Bluffs Police Department and was Plaintiff's superior for the duration of the matters at issue herein.

11. Stacie Jensen is the current Human Resources Director for the City of Council Bluffs.

12. This is an action arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C § 2000e, et. seq., to address the unlawful acts of prohibited retaliation and discrimination and violations of the Iowa Civil Rights Act, Iowa Code *§ 216 et. seq.*, against Plaintiff Miranda Adams.

## JURISDICTION AND VENUE

13. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it involves a federal question under 42 U.S.C. § 1983.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b) because this judicial district is where a substantial part of the events giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Career as a CBPD Officer

15. Plaintiff, Miranda Adams, was hired as a CBPD police officer in August 2012. As one of the few sworn female officers, Plaintiff faced many challenges during her tenure with CBPD. Despite these challenges, Plaintiff excelled in her role with CBPD, as demonstrated by her numerous accolades, awards, and excellent performance evaluations. Plaintiff won awards and accolades from individuals both inside and outside the Department for the excellent police work she did, including being the first female Defense Tactics Trainer in Department history as well as a Crisis Negotiator for CBPD. Plaintiff also assisted in the training of new recruits as a field training officer.

16. In 2018, Plaintiff was selected to join the Narcotics Unit of the Department as a Detective with the Southwest Iowa Narcotics Enforcement Taskforce ("SWINE"). As a Detective in SWINE, Plaintiff found her niche and passion: fentanyl investigations. Though she received push back from her direct superiors, Plaintiff understood the danger that fentanyl posed to the Council Bluffs community well before it began to make national headlines. Through her diligent work pursuing fentanyl and other drug cases, Miranda was able to bring numerous successful cases to the Federal Bureau of Investigation ("FBI") and other federal agencies. Her fentanyl investigation work won her an award and recognition from FBI officials.

### B. March 2020 Internal Complaint

17. In March 2020, following several months of being berated and harassed by a fellow male coworker and not being supported by her superiors,

Plaintiff filed a formal internal complaint through the appropriate channels to report gender harassment and negative treatment based on her gender.  Even then, Plaintiff was very cautious in her March 2020 complaint, as she was "fearful of the potential stigma and retaliation" that raising these allegations may cause.

18. While Plaintiff was not made aware of the ultimate findings from her March 2020 complaint, her direct superior, Sergeant Robert Radford, was disciplined as a result of her complaint via a written reprimand from CBPD Police Chief Carmody.

19. Following her 2020 complaint of harassment, Plaintiff received her annual evaluation from her supervisors, Sergeant Radford and Lieutenant Chad Meyers. Both individuals had been referenced in her 2020 internal complaint, and Sergeant Radford was disciplined as a result of said complaint.  While Plaintiff's previous evaluation had been "excellent," with her receiving the highest grade possible in most areas, her 2020 evaluation was decidedly negative.  Moreover, her 2020 workplace harassment complaint was expressly referenced in her 2020 performance evaluation, demonstrating that her superiors believed it was relevant to her evaluation.

20. Plaintiff appealed her 2020 evaluation, citing retaliation, as the same individuals she named in her internal harassment complaint were evaluating her performance.  Following Plaintiff's appeal, Sergeant Radford and Lieutenant Meyers filed an amended evaluation that resulted in higher grades and no reference to her 2020 internal complaint.

21. Despite the amended evaluation, Plaintiff was still the subject of hyper scrutiny and "tone policing" by Defendant, including her chain of command.

22. Even after the retaliatory evaluation given by her superiors, Plaintiff continued to persevere and was an excellent Detective.  Plaintiff's investigative skills were so lauded that she, a CBPD officer, was personally requested by FBI Supervisory Special Agent John Hallock to join an FBI Task Force. Agent Hallock oversaw both the Child Exploitation Task Force and the Transnational Organized Crime-West Taskforce ("TOC-West"), a task force investigated organized crime and drug operations in the broader region.  A position on an FBI task force would provide Plaintiff with more flexibility, responsibilities, recognition, contacts with upper command rank, benefits, professional development, access to more intelligence resources, opportunities for collaboration with other officers and

agencies, a nicer take-home vehicle, and additional overtime opportunities. Chief Carmody and CBPD command staff denied the FBI's initial request for Plaintiff to join the Child Exploitation Task Force. Eventually, after request from the Drug Enforcement Agency ("DEA") to join its Tactical Diversion Squad Task Force, and another request from the FBI for Plaintiff to join a task force, Plaintiff was allowed by CBPD to join the TOC-West task force in 2022 and employ her specialized skills to serve the broader community, while gaining the above referenced benefits and experience for herself.

### C.     Disciplinary Action Notice and Internal Affairs

23.     After her 2020 evaluation, on or about August 26, 2021, one day prior to her nine-year anniversary as a sworn police officer, and on the last day of the evaluative period, Plaintiff received a written Disciplinary Action Notice ("DAN") from Sergeant Radford following an interaction between the two surrounding a controlled substance purchase by a CBPD informant. This was her first DAN received during her entire tenure with CBPD. Sergeant Radford felt that Plaintiff showing him a page from her training manual concerning handling informants was "discourteous and disrespectful". The DAN explicitly stated that "further incidents may lead to further disciplinary action including removal from the SWINE Task Force and up to and including termination."

24.     Following her receipt of the August 2021 DAN, Plaintiff filed a formal grievance with the CBPD, Chief Carmody, HR Director Stacie Jensen, and Mayor Walsh, appealing the DAN, stating that it was "in response to and motivated by" her 2020 internal complaint of workplace harassment and that she feared "further retaliation and slander by her department." Plaintiff explained the extreme challenges of being a woman in law enforcement, how she was the only sworn female office assigned to the Narcotics Unit of CBPD since at least August 2012, and how Plaintiff's character and integrity were under attack. Defendant rejected Plaintiff's appeal and upheld the August 2021 DAN.

25.     On or about August 24, 2022, following a year of fearfulness of her future and trepidation of her every move within CBPD, Plaintiff became the subject of an internal affairs investigation concerning "interrupting" fellow CBPD Detectives Damrow and Burleigh during an interview of a suspect following

previous directives from Detective Damrow for Plaintiff to communicate with said suspect. Plaintiff assisted in the interview of the subject. She provided her fellow Detectives with useful advice for dealing with said suspect and turned the investigation over to Detective Paul Damrow. Despite her assistance, once again, Plaintiff was the subject of an investigation of her being "discourteous and disrespectful" to her fellow officers. This investigation was retaliation against Plaintiff for her prior complaints to her superiors.

26. Sergeant Radford told Plaintiff that multiple other male members in her unit had written negative memos about her even though they were not present for the incident. Radford went on to tell Plaintiff that detectives and officers made comments to him about issues with Plaintiff regarding the incident despite not being present for it nor having any firsthand knowledge. When Plaintiff questioned why Sergeant Radford allowed these memos and open conversations to take place, all of which severely harmed her reputation, Sergeant Radford accused Plaintiff of having an attitude and being "snarky."

27. On or about September 14, 2022, Plaintiff met with her Fraternal Order of Police ("FOP") Union Representative and Criminal Investigations Division Detective, James Springman ("Detective Springman"), to prepare for an investigative interview in response to the Internal Affairs investigation. In this meeting, Detective Springman told Plaintiff that CBPD administrators and her superiors had intentions of removing her from the SWINE taskforce and sending her back to being a patrol officer.

28. Plaintiff was never made aware of the outcome of the August 2022 Internal Affairs investigation.

29. On or about October 11, 2022, Plaintiff became the subject of yet another instance of retaliation when Internal Affairs opened another investigation regarding her tone. Plaintiff was accused of being rude to Sergeant Radford during a phone call in which she requested to respond to an incident and be the primary officer in a case she was already investigating. Sergeant Radford denied her request. Plaintiff asked Radford why she was being denied assisting in the incident considering it was a case she was working on and with knowledge of how important her statistics and evaluations were. Instead, Sergeant Radford assigned the case to Detective Matt Conahan and Detective Travis Bradley. Once again, Plaintiff was not notified of the outcome of this Internal Affairs investigation.

30.     Ultimately, it became quite clear to Plaintiff that she was in a "lose-lose" situation.  If she did not actively work cases and build her statistics, she would fail to show improvement and receive negative evaluations that would be detrimental to her career.  However, if she did ask why she was not being assigned cases that went to her male counterparts, Plaintiff was labeled as being "rude" and "disrespectful."  It is obvious that the Defendant was attempting to force Plaintiff to quit

31.     The retaliatory actions against Plaintiff became so severe that she took FMLA leave for her mental health.

**D.     ICRC/EEOC Complaint**

32.     On or about November 8, 2022, after returning from FMLA leave, Plaintiff filed charges of retaliation, discrimination, failure to promote, demotion, harassment, termination, and undesirable assignment/transfer, satisfying the procedural requirements of *42 U.S.C. § 2000e-5(a)-(e)*, with the Iowa Civil Rights Commission ("ICRC") and the EEOC.  Such charges were filed within 180 days after the alleged unlawful employment practices occurred.

33.     In her accompanying and mandated ICRC questionnaire, Plaintiff explained her reasoning for marking the above referenced boxes on her ICRC and EEOC Complaint.  She believed that her 2020 and 2021 evaluations, her DANs, and her Internal Affairs investigations were retaliatory in nature, and in direct response to her 2020 internal harassment complaint.

34.     Plaintiff also alleged that she was discriminated against by Defendant based on her sex, as she was the *only* female officer in the CBPD Narcotics Division.  Plaintiff recalled back to a conversation with Detective Springman in which he told Plaintiff, after he had a conversation with Chief Carmody about her, that the Chief thought Plaintiff was essentially "worthless".

35.     Plaintiff's questionnaire also explained why she marked the demotion, failure to promote, and termination boxes in her ICRC Complaint.  Plaintiff explicitly stated that she had not been formally demoted at the time of filing the Complaint, but that she had been informed by her FOP union representative that Chief Carmody intended to remove her from the SWINE Narcotics task force, where she worked Monday through Thursday, 9:00 a.m. to 7:00

p.m. (three-day weekends every week), in plain clothes and a take-home car, and instead move her to uniform patrol where Plaintiff would have been assigned to work 3:00 p.m. to 11:00 p.m. or 11:00 p.m. to 7:00 a.m., with only four weekend days off every quarter.  This move would constitute a demotion from not only Plaintiff's perspective, but from every reasonable officer's perspective.

36. Plaintiff also stated that she was informed by CBPD Captain Greg Schultz that she would not be promoted, despite being at the top of the promotion list for CBPD.  Every person that was ahead of Plaintiff on the promotion list had in fact already been promoted. Lieutenant Meyers had expressed plans of retirement to CBPD while Plaintiff was on the promotion list.  Yet, Plaintiff was informed that she would not be promoted to Sergeant by the Captain of the CBPD, despite being a qualified candidate and on the top of the promotion list.  CBPD intentionally refused to promote Plaintiff prior to the list's expiration in anticipation of the known retirements of Chief Carmody and Lieutenant Meyers, despite doing such for other officers in the past.  CBPD ensured that there would be no openings for promotion to Sergeant until after the promotion list expired for the term, making any attempt to apply or protest by Plaintiff futile.  Plaintiff was never promoted despite being number one on the CBPD list.

37. Finally, Plaintiff noted that while she had not been terminated at the time of filing the Complaint, she had been threatened with termination in writing by her superiors in her DANs.  She explicitly stated that her "understanding is and was; if I received any more Disciplinary Action Notice I could receive a suspension, be kicked out of the SWINE task force, or face a termination, or a combination of the aforementioned."

### E. The Investigation

38. Following Plaintiff's filing of her ICRC and EEOC Complaint, Defendant City of Council Bluffs commenced an investigation into her claims. CBPD and City of Council Bluffs documents and testimony from witnesses demonstrate that this investigation was instituted in direct response to Plaintiff's ICRC and EEOC Complaint.

39. As part of its response Plaintiff's ICRC Complaint, CBPD and the City of Council Bluffs retained an attorney named Jason Palmer to conduct an

investigation into her allegations, conduct interviews, and make findings on the veracity of Plaintiff's Complaint.

40. Mr. Palmer conducted interviews with Detective Springman, Chief Carmody, Captain Schultz, and Plaintiff herself to investigate Plaintiff's claims.

41. In their interviews with Palmer, Chief Carmody and Detective Springman both denied that the Chief ever described Plaintiff as "worthless." Detective Springman told Mr. Palmer that not only did Chief Carmody not describe Plaintiff as "worthless," but that the Chief would never say "anything bad about anybody", and that even if he did, Springman would never go and tell anyone about the conversation he had with the Chief, as he "wouldn't have much reputation or trust with anybody" if he did so.

42. In her interview with Palmer, Plaintiff reiterated that Detective Springman called her told her that the Chief described her as "worthless" in a meeting about Plaintiff between Springman and the Chief. Plaintiff told Palmer that she was shocked to hear Springman say her superior thought so little of her and that she felt she was "walking on eggshells."

43. During Plaintiff's interview with Palmer, she was also questioned about her ICRC/EEOC Complaint. Specifically, he asked about her marking the boxes for "Demotion," "Failure to Promote," and "Termination". As it pertains to Demotion, as she stated in her ICRC/EEOC Questionnaire, she explicitly told Palmer that she had not yet been demoted but was threatened with removal from both the SWINE and FBI task forces and sent back to being a uniformed patrol officer, which would constitute a demotion from any detective's point of view.

44. Regarding her marking the box labeled "Termination" on her ICRC/EEOC Complaint, just as she explained in her accompanying Questionnaire, Plaintiff told Palmer that she had not been terminated, but felt threatened with termination in writing via the Disciplinary Action Notices she received for allegedly being discourteous, which explicitly state "further incidents may lead to further disciplinary action…up to and including termination." Plaintiff felt that she was not guilty of being discourteous in her role as an officer, so she took this language as a threat of termination. Plaintiff explicitly told Palmer the DANs were the only threats of termination that she had received.

45. Finally, concerning her marking the box labeled "Failure to Promote," Plaintiff told Palmer that Captain Shultz told her she would not get

promoted, despite her being at the top of the Civil Service promotion list, just as she stated in her ICRC/EEOC Questionnaire.

46. Throughout her interview with Palmer, Plaintiff grew frustrated by Palmer jumping from allegation to allegation, instead of letting her explain her ICRC/EEOC claims in chronological order. She explicitly requested that the interview be conducted chronologically no less than five times throughout the interview. Plaintiff told Palmer that going in chronological order would help her organize her thoughts and get everything right. Despite Palmer repeatedly assuring he would conduct the interview chronologically, he failed to do so.

47. Plaintiff also grew frustrated that Palmer seemingly failed to review relevant documents, videos, or interview key witnesses prior to interviewing her. Palmer was unaware of several pivotal incidents that formed the basis of Plaintiff's ICRC/EEOC Complaint. She told Palmer that she felt "like it would be a more conductive interview had you been able…to review some of these documents…I don't know what the purpose of this interview is." Plaintiff even offered to provide Palmer with certain documents to review and was willing to sit for a second interview following his review.

48. Following the conclusion of his sole interview with Plaintiff, Palmer submitted a report to the City of Council Bluffs with his findings on February 28, 2023. Palmer determined that Plaintiff was untruthful when she stated that Detective Springman told her that Chief Carmody described her as "worthless."

49. On March 16, 2023, the City of Council Bluffs issued Plaintiff yet another unwarranted and unsubstantiated Disciplinary Action Notice, stating that she made untrue statements in her ICRC/EEOC Complaint and to Mr. Palmer in her interview regarding the "worthless" comment, and the boxes she checked on her Complaint. The recommended action to be taken was termination.

50. Prior to terminating Plaintiff, the City of Council Bluffs conducted a due process ("*Loudermill*") hearing on March 21, 2023, to afford Plaintiff the opportunity to be heard. At the hearing, Plaintiff reaffirmed that she was telling the truth in the ICRC/EEOC Complaint and that she told the truth to Mr. Palmer. Plaintiff stated that she was displeased with how the interview was conducted. She was not given the opportunity to fully share her story as, despite her multiple requests and his assurances, Mr. Palmer did not conduct the interview in a chronological manner. She stated how difficult it was for her to jump over multi-

year periods from instance to instance, instead of a straight timeline, as seen in the transcript of the interview.

51. Plaintiff also told those present during her *Loudermill* hearing that though she was more than willing to sit for a second interview, she was unable to do so. She admitted that there may have been conversations between her lawyer and Mr. Palmer regarding a second interview, but that she was never personally offered one after the first interview concluded.

52. Following the *Loudermill* hearing, on March 31, 2023, Plaintiff was terminated from Council Bluffs Police Department for alleged violations of City of Council Bluffs Policy 800, "Work Rules/Standards of Conduct" and Council Bluffs Police Department Policy 320, "Standards of Conduct." The City's termination letter states that Plaintiff was not only untruthful in her ICRC/EEOC Complaint and in her interview with Mr. Palmer, but that she was also untruthful in her *Loudermill* hearing regarding her requests to conduct her interview with Palmer chronologically and her opportunity to sit for a second interview with Palmer.

**F.     Iowa Civil Service Commission Trial**

53. On April 13, 2023, Plaintiff filed an appeal of her termination with the Iowa Civil Service Commission, pursuant to Iowa Code Section 400.

54. A two-day trial for Plaintiff's appeal took place on August 30-31, 2023, in which both parties submitted evidence and multiple witnesses.

55. At the trial, Detective Springman's denial that he ever told Plaintiff that Chief Carmody described her as worthless simply unraveled. Springman admitted that he, in fact, did tell Plaintiff about a conversation he had with Chief Carmody about her that was overtly negative, in which the Chief told him he was leaning toward "taking her out", that she was "disruptive and ineffective" and that she should be concerned about her career prospects. Most importantly, when asked whether he ever used the term "worthless" in his conversation with Plaintiff, instead of a straightforward denial like he gave to Mr. Palmer, Detective Springman could not recall whether he ever used the term "worthless," but remembers that the adjectives he used in the call were "not complimentary."

56. Mr. Palmer testified that he relied on his interview with Detective Springman above all others to determine that Plaintiff was untruthful. Detective

Springman's inconsistency and testimony on the stand demonstrated that he was an uncredible witness for Mr. Palmer and the City of Council Bluffs.

57. HR Director Jensen and Chief Carmody admitted that they initiated the investigation into Plaintiff following her ICRC/EEOC Complaint. HR Director Jensen stated that though she was aware of the provisions of the Civil Rights Act prohibiting discrimination and retaliation based on gender, and the Participation clause following the filing of an EEOC action, the City still decided to terminate Plaintiff because it felt Plaintiff was untruthful.

58. While on the stand at trial, Plaintiff's testimony was consistent with both her ICRC/EEOC Complaint and her interview with Mr. Palmer: Springman told her Chief Carmody called her "worthless"; she felt threatened with demotion and termination, though neither actually occurred, she asked Palmer to conduct the interview chronologically multiple times, but he failed to do so; and she was willing to sit for a second interview.

59. Following testimony from 10 witnesses and hundreds of pages of exhibits, the Iowa Civil Service Commission entered a unanimous judgment overturning the City of Council Bluff's termination of Plaintiff, finding that her "actions were not serious enough to warrant termination."

60. Despite the Iowa Civil Service Commission overturning of Plaintiff's termination, the City of Council Bluffs and the CBPD refused to reinstate Plaintiff, yet another act of retaliation against Plaintiff and in violation of Iowa Code Section 400.27(5).

61. Throughout the relevant time period, beginning with the filing of her ICRC/EEOC Complaint, Plaintiff engaged in protected activity pursuant to *42 U.S.C § 2000e, et. seq.* Plaintiff voiced her charges of discrimination and retaliation by her employer in her Complaint and accompanying Questionnaire.

62. The City's own internal documents demonstrate that the independent investigation was triggered and caused solely and specifically by Plaintiff's ICRC/EEOC Complaint.

63. Plaintiff was entitled to be free from retaliation by her employer for participating in the investigation and subsequent hearings, pursuant to *42 U.S.C § 2000e, et. seq. (2000)*.

64. Defendant wrongfully retaliated against Plaintiff for engaging in such protected activity to damage Plaintiff's professional reputation and prevent

Plaintiff from obtaining employment with another law enforcement agency. These retaliatory measures were continuous and intentional by Defendant.

65. Despite a two-day trial with the Iowa Civil Service Commission and an order overturning the retaliatory termination, Defendant still refused to reinstate Plaintiff.

66. Plaintiff will likely never be afforded the opportunity to work in law enforcement again, nor fulfill her true passion to serve her community, as Defendant's retaliatory termination makes it nearly impossible to obtain employment as an officer or agent, due to the *Brady-Giglio* list.

67. As a direct and proximate result of Defendant's actions against Plaintiff in retaliation, Plaintiff has suffered damages, including but not limited to, a damaged professional reputation, loss of gainful employment, loss of future employment, loss in long-term pension benefits, and loss in the opportunity for higher pay. Plaintiff lost her dream job and any opportunity to advance further.

## **FIRST CAUSE OF ACTION:**
## **RETALIATION**

68. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

69. Plaintiff completed her ICRC/EEOC Complaint and accompanying Questionnaire earnestly and truthfully. She filed her claims against the City of Council Bluffs and CBPD as a last resort, as she had been repeatedly retaliated against by her superiors. Plaintiff truthfully stated in her ICRC/EEOC Complaint that though she felt threatened with demotion and termination, she had yet to be demoted or terminated. Plaintiff explained the sincere trepidation she felt going to work every day, when your boss, the Chief of Police, allegedly described you as "worthless."

70. The City and CBPD's investigation and subsequent internal affairs investigation into Plaintiff's ICRC/EEOC claims constitute protected activity pursuant to *42 U.S.C § 2000e-3(a)*, the "participation clause," which makes it unlawful employment practice for an employer to discriminate against any of its employees because they have made a charge, testified, assisted, or participated in

any manner in an investigation, proceeding, or hearing under subchapter *42 U.S.C § 2000e-3 (2000)*.

71. The Defendant retaliated against Plaintiff for statements made in her ICRC/EEOC Complaint and during the aforementioned investigations by suspending her and ultimately terminating her, in direct violation of her civil rights under *42 U.S.C § 2000e-3 (2000)* and Iowa Code § 216 *et. seq.*

72. Plaintiff's protected activity was one "but for" cause of Defendant's retaliatory actions.

73. As a direct and proximate result of Defendant's unlawful retaliation against Plaintiff for her ICRC/EEOC claim filed November 8, 2022, and her subsequent participation in such investigation thereof, Plaintiff has suffered economic losses, career opportunity losses, future earnings, and lost benefits in an amount to be determined at trial, and severe mental and emotional anguish from a severely damaged professional reputation and pension benefits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests an Order as follows:
1. Special damages for her past and future lost wages and benefits;
2. Compensatory damages for the violations of her constitutional and statutory rights;
3. Punitive damages, to the extent permitted by law;
4. Appropriate equitable and injunctive relief;
5. Attorneys' fees pursuant to 42 U.S.C. § 2000e-5(k);
6. Costs of suit;
7. Pre- and post-judgment interest; and
8. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Dated this 19th day of July, 2024.

                        MIRANDA ADAMS, Plaintiff.

BY:   */s/ Elizabeth A. Culhane*
      Elizabeth A. Culhane, AT0013212
      Steven R. Hogan II, AT0015008
      FRASER STRYKER PC LLO
      500 Energy Plaza
      409 South 17th Street
      Omaha, NE 68102
      (402) 341-6000
      (402) 341-8290- fax
      eculhane@fraserstryker.com
      shogan@fraserstryker.com

3214822v6